# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BRIAN GORDON, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>COMMERCEHUB, INC., RICHARD N. BAER, MARK P. CATTINI, MICHAEL P. HUSEBY, LUIS ANTONIO UBINAS, DAVID GOLDHILL, BRIAN J. WENDLING, CHAD HOLLINGSWORTH, FRANCIS POORE, and BETSY MORGAN,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Case No.   1:18-cv-512 (FJS/DJS)

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

**JURY TRIAL DEMANDED**

Plaintiff Brian Gordon ("Plaintiff"), by his undersigned attorneys, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1.      This action is brought as a class action by Plaintiff on behalf of himself and the other public holders of the common stock of CommerceHub, Inc. ("CommerceHub" or the "Company") against the Company and the members of the Company's board of directors (collectively, the "Board" or "Individual Defendants," and, together with CommerceHub, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a), SEC Rule 14a-9, 17 C.F.R. 240.14a-9, and Regulation G, 17 C.F.R. § 244.100, in connection with the proposed merger (the "Proposed Merger") between CommerceHub and certain affiliates of GTCR LLC ("GTCR") and Sycamore Partners Management, L.P. ("Sycamore").

2.      On March 5, 2018, the Board caused the Company to enter into an agreement and plan of merger ("Merger Agreement"), pursuant to which each share of CommerceHub common stock will be exchanged for $22.75 in cash, representing approximately $1.1 billion in the aggregate (the "Merger Consideration").

3.      On April 18, 2018, in order to convince CommerceHub shareholders to vote in favor of the Proposed Merger, the Board authorized the filing of a materially incomplete and misleading Definitive Proxy Statement on Schedule 14A (the "Proxy") with the Securities and Exchange Commission ("SEC"), in violation of Sections 14(a) and 20(a) of the Exchange Act.

4.      While Defendants are touting the fairness of the Merger Consideration to the Company's shareholders in the Proxy, they have failed to disclose certain material information that is necessary for shareholders to properly assess the fairness of the Proposed Merger, thereby rendering certain statements in the Proxy false and/or misleading.

5.      In particular, the Proxy contains materially incomplete and misleading information concerning: (i) financial projections for the Company; (ii) the sale process leading up to the Proposed Merger; and (iii) certain prior relationships between the Company's financial advisor, Evercore Group L.L.C. ("Evercore") and GTCR.

6.      It is imperative that the material information that has been omitted from the Proxy is disclosed to the Company's shareholders prior to the forthcoming shareholder vote so that they can properly exercise their corporate suffrage rights.

7.      For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for contraventions of (i) Rule 14a-9, and (ii) Regulation G, 17 C.F.R. § 244.100, in violation of Sections 14(a) and 20(a) of the Exchange Act.  Plaintiff seeks to enjoin Defendants from holding the shareholder vote on the Proposed Merger and taking any steps to consummate

the Proposed Merger unless, and until, the material information discussed below is disclosed to CommerceHub shareholders sufficiently in advance of the vote on the Proposed Merger or, in the event the Proposed Merger is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Section 14(a) and 20(a) of the Exchange Act.

9.      Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

10.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because CommerceHub is headquartered in this District.

## PARTIES

11.     Plaintiff is, and at all relevant times has been, a CommerceHub shareholder.

12.     Defendant CommerceHub is incorporated in Delaware and maintains its principal executive offices at Zen Building, 201 Fuller Road, 6th Floor, Albany, New York 12203.  The Company trades on the Nasdaq GM under the ticker symbol "CHUBA".

13.     Individual Defendant Richard N. Baer has served as CommerceHub's Chairman since July 2016 and as a director since March 2016.

14.     Individual Defendant Mark P. Cattini has served as director of CommerceHub since

July 2016.

15.    Individual Defendant Michael P. Huseby has served as director of CommerceHub since July 2016.

16.    Individual Defendant Luis Antonio Ubinas has served as director of CommerceHub since July 2016.

17.    Individual Defendant David Goldhill has served as director of CommerceHub since July 2016.

18.    Individual Defendant Brian J. Wendling has served as director of CommerceHub since July 2016.

19.    Individual Defendant Chad Hollingsworth has served as director of CommerceHub since July 2016.

20.    Individual Defendant Francis Poore is the founder of CommerceHub and has served as its President and Chief Executive Officer since Jan 2013.  Poore has been a director of CommerceHub since July 2016.

21.    Individual Defendant Betsy Morgan has served as director of CommerceHub since July 2016.

22.    The Individual Defendants and CommerceHub may collectively be referred to as "Defendants."  Each of the Individual Defendants herein is sued individually as well as in his or her capacity as an officer and/or director of the Company, and the liability of each arises from the fact that he or she has engaged in all or part of the unlawful acts, plans, schemes, or transactions complained of herein.

## CLASS ACTION ALLEGATIONS

23.     Plaintiff brings this class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and the other public shareholders of CommerceHub (the "Class").  Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendant.

24.     This action is properly maintainable as a class action because:

a.     The Class is so numerous that joinder of all members is impracticable.  As of April 18, 2018, there were approximately 13,614,132 shares of CommerceHub Series A common stock and 707,567 shares of CommerceHub Series B common stock outstanding, held by hundreds to thousands of individuals and entities scattered throughout the country. The actual number of public shareholders of CommerceHub will be ascertained through discovery;

b.     There are questions of law and fact that are common to the Class that predominate over any questions affecting only individual members, including the following:

i)     whether Defendants disclosed material information that includes non-GAAP financial measures without a presentation and reconciliation of the same non-GAAP financial measures to their most directly comparable GAAP equivalent in violation of Section 14(a) of the Exchange Act;

ii)     whether Defendants have misrepresented or omitted material information concerning the Proposed Merger in the Proxy in violation of Section 14(a) of the Exchange Act;

iii)    whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

iv)    whether Plaintiff and other members of the Class will suffer irreparable harm if compelled to vote their shares regarding the Proposed Merger based on the materially incomplete and misleading Proxy.

c.    Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class;

d.    Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

e.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the party opposing the Class;

f.    Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole; and

g.    A class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

## SUBSTANTIVE ALLEGATIONS

**I.    The Proposed Transaction**

25.    CommerceHub provides cloud-based technology and services, including a cloud-based e-commerce fulfillment and marketing software platform.  The Company serves large retailers, online marketplaces, digital marketing channels, consumer brands, manufacturers, and distributors.

26.    On March 6, 2018, the Company announced the Proposed Merger in a joint press release which states, in pertinent part:

> ALBANY, NY, CHICAGO, IL, NEW YORK, NY, Mar. 6, 2018 (GLOBE NEWSWIRE) — CommerceHub, Inc. (NASDAQ:CHUBA) (NASDAQ:CHUBK) ("CommerceHub"), GTCR ("GTCR"), and Sycamore Partners ("Sycamore") today announced a definitive agreement whereby affiliates of GTCR and Sycamore, two leading private equity firms, will acquire all outstanding shares of CommerceHub, a leading distributed commerce network for retailers and brands.
>
> The all-cash deal provides substantial value to CommerceHub stockholders. Under the terms of the agreement, funds affiliated with GTCR and Sycamore will acquire all outstanding shares of CommerceHub's Series A, B, and C common stock for a total value of approximately $1.1 billion. Holders of CommerceHub's Series A, B and C common stock will receive $22.75 in cash per share, representing a 24.5% premium to the Series A closing price as of March 5, 2018, a 19.3% premium to the 1-month volume-weighted average Series A closing price, a 30.2% premium to the Series C closing price as of March 5, 2018, and a 27.1% premium to the 1-month volume-weighted average Series C closing price.
>
> "This is a significant milestone for CommerceHub and a very positive outcome for our stockholders," said Frank Poore, CommerceHub's Founder, President and CEO. "GTCR and Sycamore recognize the power of CommerceHub's platform and our unique ability to transform how retailers and brands drive growth through ecommerce. Our customers rely on CommerceHub as a strategic partner to enable their most critical growth strategies, and we are confident that our relationship with GTCR and Sycamore will accelerate the development of our platform and solutions to enable the future of retail."
>
> "Frank and the CommerceHub team have built a unique company with a highly strategic position in ecommerce," said Mark Anderson, Managing Director of GTCR. "We are excited to work with Frank to continue executing on their vision

for a platform and network to tie together all sources of demand, supply and delivery in global ecommerce."

"CommerceHub is a valued partner to many leading retailers," said Peter Morrow, Managing Director of Sycamore Partners. "We look forward to working with the CommerceHub team to help them grow by continuing to enable retailers' and suppliers' ecommerce offerings."

CommerceHub's Board of Directors unanimously approved the deal and recommended that stockholders vote their shares in favor of the transaction. CommerceHub will become a privately held company and remain headquartered in Albany, NY, with offices in Seattle, WA and Hertford, England. The transaction, which is expected to close in the third quarter of 2018, is subject to customary closing conditions, including the approval of the company's stockholders and required regulatory approvals.

27.     The Merger Consideration appears inadequate in light of the Company's recent financial performance and prospects for future growth.  For instance, the Company has reported double-digit sales growth for the past three fiscal years and positive Net Income growth for the past two fiscal years.

28.     In sum, it appears that CommerceHub is well-positioned for financial growth, and that the Merger Consideration fails to adequately compensate the Company's shareholders.  It is imperative that Defendants disclose the material information they have omitted from the Proxy, discussed in detail below, so that the Company's shareholders can properly assess the fairness of the Merger Consideration for themselves and make an informed decision concerning whether or not to vote in favor of the Proposed Merger.

## II.     The Materially Incomplete and Misleading Proxy

29.     On April 18, 2018, Defendants caused the Proxy to be filed with the SEC in connection with the Proposed Merger.  The Proxy solicits the Company's shareholders to vote in favor of the Proposed Merger.  Defendants were obligated to carefully review the Proxy before it was filed with the SEC and disseminated to the Company's shareholders to ensure that it did not contain any material misrepresentations or omissions.  However, the Proxy misrepresents and/or

8

omits material information that is necessary for the Company's shareholders to make an informed decision concerning whether to vote in favor of the Proposed Merger, in violation of Sections 14(a) and 20(a) of the Exchange Act.

### *Financial Forecasts that Violate Regulation G and SEC Rule 14a-9*

30.    The Proxy discloses certain financial forecasts for the Company on page 52. However, the Proxy fails to provide material information concerning the Company's financial forecasts, which were developed by the Company's management and relied upon by the Board in recommending that the shareholders vote in favor of the Proposed Merger.  Proxy at 50.

31.    Specifically, the Proxy provides values for non-GAAP (Generally Accepted Accounting Principles) financial metrics Adjusted Gross Profit, Adjusted EBITDA, and Unlevered free cash flow ("UFCF") but fails to provide: (i) a definition for Adjusted Gross Profit or Adjusted EBITDA; (ii) any of the line items used to calculate these non-GAAP measures; nor (iii) a reconciliation of these non-GAAP metrics to their most comparable GAAP measures, in direct violation of Regulation G and consequently Section 14(a).  Proxy at 52.

32.    <u>A company's financial projections are material information a board relies on to determine whether to approve a merger transaction and recommend that shareholders vote to approve the transactions.  The financial forecasts were relied on here to approve the merger agreement and recommend this Proposed Merger to shareholders.</u> The Proxy discloses that the financial projections above were prepared by the Company's management and "provided to [the] [B]oard in their evaluation of the merger agreement", Proxy at 50, which included the consideration of "the possible alternatives to a sale to Parent, including the potential to continue as a standalone business and the pursuit of an acquisition strategy."  Proxy at 38.

33.     When soliciting proxies from shareholders, a company must furnish the information found in Schedule 14A (codified as 17 C.F.R. § 240.14a-101).  Item 14 of Schedule 14A sets forth the information a company must disclose when soliciting proxies regarding mergers and acquisitions.  In regards to financial information, companies are required to disclose "financial information required by Article 11 of Regulation S-X[,]" which includes Item 10 of Regulation S-K.  *See* Item 14(7)(b)(11) of 17 C.F.R. § 240.14a-101.

34.     Under Item 10 of Regulation S-K, companies are encouraged to disclose "management's projections of future economic performance that have a reasonable basis and are presented in an appropriate format."  17 C.F.R. § 229.10(b).  Although the SEC recognizes the usefulness of disclosing projected financial metrics, the SEC cautions companies to "take care to assure that the choice of items projected is not susceptible of misleading inferences through selective projection of only favorable items."  *Id.*

35.     In order to facilitate investor understanding of the Company's financial projections, the SEC provides companies with certain factors "to be considered in formulating and disclosing such projections[,]" including:

> (i) When management chooses to include its projections in a Commission filing, ***the disclosures accompanying the projections should facilitate investor understanding of the basis for and limitations of projections.*** In this regard investors should be cautioned against attributing undue certainty to management's assessment, and the Commission believes that investors would be aided by a statement indicating management's intention regarding the furnishing of updated projections. ***The Commission also believes that investor understanding would be enhanced by disclosure of the assumptions which in management's opinion are most significant to the projections or are the key factors upon which the financial results of the enterprise depend and encourages disclosure of assumptions in a manner that will provide a framework for analysis of the projection.***

> (ii) Management also should consider whether disclosure of the accuracy or inaccuracy of previous projections would provide investors with important insights into the limitations of projections. In this regard, ***consideration should be given to presenting the projections in a format that will facilitate subsequent analysis of the reasons for differences between actual and forecast results.*** An important

benefit may arise from the systematic analysis of variances between projected and actual results on a continuing basis, since such disclosure may highlight for investors the most significant risk and profit-sensitive areas in a business operation.

17 C.F.R. § 229.10(b)(3) (emphasis added).

36.     The SEC further believes that those potential "misleading inferences" are exacerbated when the disclosed information contains non-GAAP financial measures[1] and adopted Regulation G[2] "to ensure that investors and others are not misled by the use of non-GAAP financial measures."[3]  More specifically, the company must disclose the most directly comparable GAAP financial measure **_and_** a reconciliation (by schedule or other clearly understandable method) of the differences between the non-GAAP financial measure disclosed or released with the most comparable financial measure or measures calculated and presented in accordance with GAAP. 17 C.F.R. § 244.100.  This is because the SEC believes "this reconciliation will help investors . . . to better evaluate the non-GAAP financial measures . . . [and] more accurately evaluate a companies' securities and, in turn, result in a more accurate pricing of securities."[4]  Compliance with Regulation G is mandatory under Section 14(a), and non-compliance constitutes a violation of Section 14(a).

37.     Moreover, the SEC has publicly stated that the use of non-GAAP financial measure can be misleading.[5]  Former SEC Chairwoman Mary Jo White has stated that the frequent use by

---

[1]     Non-GAAP financial measures are numerical measures of future financial performance that exclude amounts or are adjusted to effectively exclude amounts that are included in the most directly comparable GAAP measure. 17 C.F.R. §244.101(a)(1).

[2]     Item 10 of Regulations S-K and S-B were amended to reflect the requirements of Regulation G.

[3]     United States Securities and Exchange Commission, _Final Rule: Conditions for Use of Non-GAAP Financial Measures_ (2002), _available at_ https://www.sec.gov/rules/final/33-8176.htm ("SEC, _Final Rule: Conditions for Use of Non-GAAP Financial Measures_").

[4]     SEC, _Final Rule: Conditions for Use of Non-GAAP Financial Measures_.

[5]     _See, e.g_., Nicolas Grabar and Sandra Flow, _Non-GAAP Financial Measures: The SEC's Evolving Views_, Harvard Law School Forum on Corporate Governance and Financial Regulation

publicly traded companies of unique company-specific non-GAAP financial measures (as CommerceHub included in the Proxy here), implicates the centerpiece of the SEC's disclosures regime:

> In too many cases, the non-GAAP information, which is meant to supplement the GAAP information, has become the key message to investors, crowding out and effectively supplanting the GAAP presentation.  Jim Schnurr, our Chief Accountant, Mark Kronforst, our Chief Accountant in the Division of Corporation Finance and I, along with other members of the staff, have spoken out frequently about our concerns to raise the awareness of boards, management and investors. And last month, the staff issued guidance addressing a number of troublesome practices *which can make non-GAAP disclosures misleading*: the lack of equal or greater prominence for GAAP measures; exclusion of normal, recurring cash operating expenses; individually tailored non-GAAP revenues; lack of consistency; cherry-picking; and the use of cash per share data.  I strongly urge companies to carefully consider this guidance and revisit their approach to non-GAAP disclosures.  I also urge again, as I did last December, that appropriate controls be considered and that audit committees carefully oversee their company's use of non-GAAP measures and disclosures.[6]

38.    Thus, to bring the Proxy into compliance with Regulation G and cure the materially misleading nature of the non-GAAP forecasts under SEC Rule 14a-9 as a result of the omitted information on page 52, Defendants must provide a reconciliation table of the non-GAAP measures to the most comparable GAAP measures.

39.    At the very least, the Company must disclose the line item forecasts for the financial metrics that were used to calculate the aforementioned non-GAAP measures.  Such forecasts are necessary to make the non-GAAP forecasts included in the Proxy not misleading.  Indeed, Defendants acknowledge that the non-GAAP forecasts are material to shareholders, but

---

(June 24, 2016), https://corpgov.law.harvard.edu/2016/06/24/non-gaap-financial-measures-the-secs-evolving-views/; Gretchen Morgenson, *Fantasy Math Is Helping Companies Spin Losses Into Profits*, N.Y. Times, Apr. 22, 2016, http://www.nytimes.com/2016/04/24/business/fantasy-math-is-helping-companies-spin-losses-into-profits.html?_r=0.

[6]    Mary Jo White, *Keynote Address, International Corporate Governance Network Annual Conference: Focusing the Lens of Disclosure to Set the Path Forward on Board Diversity, Non-GAAP, and Sustainability* (June 27, 2016), https://www.sec.gov/news/speech/chair-white-icgn-speech.html. (emphasis added) (footnotes omitted).

nevertheless are misleading when isolated from GAAP compliant forecasts, as shareholders are cautioned:

> The Projections and Extended Financial Projections include non-GAAP measures of Adjusted Gross Profit, Adjusted EBITDA and unlevered free cash flow. We report Adjusted EBITDA in our reports filed with the SEC because management considers Adjusted EBITDA in reviewing our financial performance because we feel it is a relevant measure of the overall efficiency of our business model. Adjusted EBITDA (as well as Adjusted Gross Profit and unlevered free cash flow, as set forth below) is not a substitute for, or superior to, and should be considered only in addition to, net income (or the applicable comparable measure) calculated in accordance with GAAP, reports of which on a historical basis may be found in our 2017 Annual Report and subsequent Quarterly Reports on Form 10-Q. In addition, our computation of the non-GAAP measures described below may not be comparable to other similarly titled measures computed by other companies, because all companies do not calculate these measures in the same fashion.

Proxy at 51.

### *The Materially Misleading Description of the Sale Process*

40.    The Proxy discloses that the Company and certain interested parties entered into non-disclosure agreements ("NDA"), which contained "standstill and certain restrictions on the potential purchasers' ability to request a waiver of such standstill from CommerceHub." Proxy at 29. The Proxy further discloses that "[a]ll such provisions other than those applicable to Sponsor B fell away upon entry by CommerceHub into the merger agreement." *Id.* The Proxy does not provide any further information regarding the terms of Sponsor B's NDA, or why Sponsor B was treated differently.

41.    Unless the Company discloses additional information regarding the restrictions contained in Sponsor B's NDA, shareholders are unable to discern whether the Proposed Merger is in fact the best strategic alternative, or whether there is a better alternative that is currently prohibited from being made public. As a result, the description of the sale process and the NDAs is materially misleading as shareholders are unable to determine whether Sponsor B is currently prohibited from making a topping bid.

42.    The Proxy also discloses certain information regarding Evercore's prior relationships with the parties to the Proposed Merger.  Proxy at 49-50.  Specifically, the Proxy discloses that "during the two-year period prior to the date of Evercore's opinion, Evercore and its affiliates did provide investment banking services to GTCR or one or more of its affiliated investment funds, an affiliate of Parent, in connection with a certain unrelated acquisition transaction by GTCR, for which Evercore and its affiliates have received compensation."  Proxy at 50.  The Proxy fails to provide the amount of compensation Evercore received from GTCR, which in light of the services rendered, an acquisition, very well could have been substantial.

43.    The failure to provide the amount of compensation that Evercore received from GTCR is, in and of itself, a violation of Section 14(a) for failure to comply with Item 1015 of Regulation M-A, codified as 17 C.F.R. § 229.1015(b)(4), which requires a description of any material relationships between a financial advisor and a party to a transaction.  Notwithstanding this violation, the failure to provide additional information regarding Evercore's past services to GTCR renders the disclosure of Evercore's prior relationships materially misleading because shareholders are not able to determine whether Evercore's past and potential future compensation may have influenced its fairness opinion.  This is particularly material here, where the financial advisor's prior relationship is with GTCR, which is buying CommerceHub.

44.    Clearly, shareholders would find this information material since the Board's unanimous recommendation that shareholders vote in favor of the Proposed Merger was based, in part on the following:

> *CommerceHub's Business, Financial Condition and Prospects*.  Our board considered its in-depth knowledge of our business, financial condition, and prospects, in addition to the risks and uncertainties associated with achieving and executing on CommerceHub's business and financial plans in the short and long term if CommerceHub were to remain an independent public company, including market acceptance and performance of our products and services, competitive

issues affecting CommerceHub, competitive issues facing many of CommerceHub's customers, general market conditions, regulatory matters and changes in law affecting our business, and the risk factors described in the 2017 Annual Report.

*Potential Strategic Alternatives*.  Our board considered the possible alternatives to a sale to Parent, including the potential to continue as a standalone business and the pursuit of an acquisition strategy. Our board evaluated alternatives with the assistance of Evercore, and determined that, when compared to the merger, these alternatives were not in the best interests of CommerceHub and its stockholders given the relative risks, rewards and uncertainties associated with those alternatives.

*Quality of the Process to Evaluate Strategic Alternatives*.  Our board considered the quality of its process to explore potential transactions, with the assistance of Evercore, including (i) the solicitation of numerous potential strategic purchasers and potential financial purchasers, (ii) discussions with various parties that contacted Evercore on an unsolicited basis, (iii) extensive management engagement with potential purchasers, and (iv) detailed review of all proposals received with our board's financial advisors. Our board further considered that discussions had been held with, and feedback received from, multiple interested or potentially interested parties as part of the process, including the fact that none of the potential strategic purchasers who were contacted, and none of the parties that contacted Evercore on an unsolicited basis, chose to participate in the process to pursue strategic alternatives and the fact that neither Sponsor A nor Sponsor B remained in the process. Additionally, our board considered the risk that prolonging the strategic review process could have resulted in the loss of a favorable opportunity to successfully consummate a transaction with GTCR and Sycamore and was unlikely to result in a proposal materially better than GTCR and Sycamore's proposal.

*Evercore's Fairness Opinion and Related Analyses*.  Our board considered the financial analyses that representatives of Evercore reviewed and discussed with our board, as well as the oral opinion of Evercore rendered to our board on March 5, 2018 (which was subsequently confirmed in writing by delivery of Evercore's written opinion dated the same date) to the effect that, based upon and subject to the factors, procedures, assumptions, qualifications, limitations and other matters set forth in Evercore's written opinion, the per-share merger consideration to be paid to the holders of shares of CommerceHub common stock (other than the Excluded Stockholders) is fair, from a financial point of view, to such stockholders, as more fully described below under "*The Merger (Proposal 1)—Opinion of CommerceHub's Financial Advisors*". . . .

*Negotiation Process*.  Our board considered the fact that the terms of the merger agreement were the result of robust arm's-length negotiations conducted by

> CommerceHub, with the knowledge and at the direction of our board and with the assistance of Evercore and Baker Botts.

Proxy at 38-49.

45.    In sum, the Proxy independently violates both (i) Regulation G, which requires a presentation and reconciliation of any non-GAAP financial to its most directly comparable GAAP equivalent, and (ii) Rule 14a-9, since the material omitted information renders certain statements, discussed above, materially incomplete and misleading.  As the Proxy independently contravenes the SEC rules and regulations, Defendants violated Section 14(a) and Section 20(a) of the Exchange Act by filing the Proxy to garner votes in support of the Proposed Merger from CommerceHub shareholders.

46.    Absent disclosure of the foregoing material information prior to the special shareholder meeting to vote on the Proposed Merger, Plaintiff and the other members of the Class will not be able to make a fully-informed decision regarding whether to vote in favor of the Proposed Merger, and they are thus threatened with irreparable harm, warranting the injunctive relief sought herein.

## COUNT I

### (Against All Defendants for Violations of Section 14(a) of the Exchange Act and 17 C.F.R. § 244.100 Promulgated Thereunder)

47.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

48.    Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection

of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 USCS § 78l]."  15 U.S.C. § 78n(a)(1).

49.     As set forth above, the Proxy omits information required by SEC Regulation G, 17 C.F.R. § 244.100, which independently violates Section 14(a).  SEC Regulation G, among other things, requires an issuer that chooses to disclose a non-GAAP measure to provide a presentation of the "most directly comparable" GAAP measure, and a reconciliation "by schedule or other clearly understandable method" of the non-GAAP measure to the "most directly comparable" GAAP measure.  17 C.F.R. § 244.100(a).

50.     The failure to reconcile the numerous non-GAAP financial measures included in the Proxy violates Regulation G and constitutes a violation of Section 14(a).

## COUNT II

**(Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder)**

51.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

52.     SEC Rule 14a-9 prohibits the solicitation of shareholder votes in proxy statements that contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading[.]"  17 C.F.R. § 240.14a-9.

53.     Regulation G similarly prohibits the solicitation of shareholder votes by "mak[ing] public a non-GAAP financial measure that, taken together with the information accompanying that measure. . ., contains an untrue statement of a material fact or omits to state a material fact

necessary in order to make the presentation of the non-GAAP financial measure . . . not misleading." 17 C.F.R. § 244.100(b).

54.    Defendants have issued the Proxy with the intention of soliciting shareholder support for the Proposed Merger. Each of the Defendants reviewed and authorized the dissemination of the Proxy, which fails to provide critical information regarding, amongst other things, the financial forecasts for the Company and the combined company.

55.    In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading. Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a). The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy, but nonetheless failed to obtain and disclose such information to shareholders although they could have done so without extraordinary effort.

56.    The Individual Defendants knew or were negligent in not knowing that the Proxy is materially misleading and omits material facts that are necessary to render it not misleading. The Individual Defendants undoubtedly reviewed and relied upon the omitted information identified above in connection with their decision to approve and recommend the Proposed Merger.

57.    The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading.

58.    The Individual Defendants were, at the very least, negligent in preparing and reviewing the Proxy. The preparation of a proxy statement by corporate insiders containing

materially false or misleading statements or omitting a material fact constitutes negligence.  The Individual Defendants were negligent in choosing to omit material information from the Proxy or failing to notice the material omissions in the Proxy upon reviewing it, which they were required to do carefully as the Company's directors.  Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and the preparation of the Company's financial forecasts.

59.    CommerceHub is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the Proxy.

60.    The misrepresentations and omissions in the Proxy are material to Plaintiff and the Class, who will be deprived of their right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Merger.

61.    Plaintiff and the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT III

### (Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act)

62.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

63.    The Individual Defendants acted as controlling persons of CommerceHub within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of CommerceHub, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did

influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

64.    Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

65.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein and exercised the same.  The Proxy at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Merger.  They were thus directly involved in preparing the Proxy.

66.    In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement.  The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered.  The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

67.    By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

68.    As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these

Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Individual Defendants' conduct, Plaintiff and the Class will be irreparably harmed.

69.    Plaintiff and the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.    Declaring that this action is properly maintainable as a Class Action and certifying Plaintiff as Class Representative and his counsel as Class Counsel;

B.    Enjoining Defendants and all persons acting in concert with them from proceeding with the shareholder vote on the Proposed Merger or consummating the Proposed Merger, unless and until the Company discloses the material information discussed above which has been omitted from the Proxy;

C.    Directing Defendants to account to Plaintiff and the Class for all damages sustained as a result of their wrongdoing;

D.    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

E.    Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated:  April 27, 2018

Respectfully submitted,

**FARUQI & FARUQI, LLP**

By: _____*s/ Innessa Melamed Huot*_____

Innessa Melamed Huot (Bar Roll No. 519963)
685 Third Avenue, 26th Floor
New York, New York 10017
Telephone: 212-983-9330
Facsimile: 212-983-9331
ihuot@faruqilaw.com

*Counsel for Plaintiff*

**OF COUNSEL:**

**FARUQI & FARUQI, LLP**
Nadeem Faruqi
James M. Wilson, Jr.
685 Third Ave., 26th Fl.
New York, NY 10017
Telephone: (212) 983-9330
Email: nfaruqi@faruqilaw.com
Email: jwilson@faruqilaw.com

*Counsel for Plaintiff*